IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Garri Ambartsoumov,

        Petitioner,

       v.                       Case No. 2:12-cv-345

                                     JUDGE MICHAEL H. WATSON
Warden, Chillicothe Correctional      Magistrate Judge Kemp
Institution,

        Respondent.

**REPORT AND RECOMMENDATION**

      Petitioner, a state prisoner, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. This matter is before the Court on that petition, respondent's return of writ, the exhibits attached to the return, and the exhibits attached to the motion to dismiss. Petitioner did not file a traverse. Also before the Court is Petitioner's motion for leave to amend. For the reasons that follow, the Magistrate Judge RECOMMENDS that petitioner's claims be DISMISSED and that the motion for leave to amend be DENIED.

## I. PROCEDURAL HISTORY

      On July 11, 2008, a Franklin County, Ohio grand jury returned a two-count indictment against petitioner and his co-defendant charging felonious assault and attempted murder. *Motion to Dismiss (Doc. 8), Exhibit 1.* Petitioner pleaded not guilty and was tried by a jury jointly with his co-defendant. On September 3, 2009, the jury convicted him of felonious assault but could not reach a verdict on the attempted murder charge. *Id., Exhibits 7 and 8.* In a judgment entry filed on October 28, 2009, the trial judge sentenced petitioner to a prison term of eight years. *Id., Exhibit 9.*

      Petitioner, represented on appeal by his trial counsel, timely appealed his conviction to the Court of Appeals for the Tenth Appellate District. He raised seven

assignments of error, as follows:

    1. The trial court improperly excluded defense witnesses under Evidence Rules 404 and 608 that rebutted the State's characterizations of an alleged victims [sic] good character, thereby violating Appellant's right to present a meaningful defense as guaranteed by the Compulsory Process Clause of the Sixth Amendment, the Due Process clause of the Fourteenth Amendment to the United States Constitution, and Article I, Section 10 of the Ohio Constitution. (Tr. Trn. Vol., IV, Pg. 186-187)

    2. The trial court improperly quashed Appellant's subpoena of an [sic] non-confidential criminal investigation that rebutted the State's characterizations of an alleged victims [sic] good character, thereby violating Appellant's right to present a full defense as guaranteed by the Compulsory Process Clause of the Sixth Amendment, the Due Process clause of the Fourteenth Amendment to the United States Constitution, and Article I, Section 10 of the Ohio Constitution. (Tr. Trn. Vol. I, Pg. 86)

    3. The trial court improperly quashed Appellant's subpoena of an [sic] non-confidential criminal investigation that rebutted the State's characterizations of an alleged victims [sic] good character, thereby violating the Due Process clause of the Fourteenth Amendment and comparable provisions of the Ohio Constitution. (Tr. Trn. Vol. I, Pg. 86)

    4. The trial court improperly implied in the presence of the jury that Appellant's co-defendant should testify at trial, thereby violating Appellant's Sixth Amendment right to a trial by jury, his right to Due Process under the Fourteenth Amendment and comparable provisions of the Ohio Constitution. (Tr. Trn. Vol., IV, Pg. 82)

    5. The court improperly excluded evidence that rebutted Arut Koulian's assertions that his motive for leaving town was due to threats from Appellant's family with evidence of his financial difficulty, thereby violating Appellant's right to present a meaningful defense as guaranteed by the Compulsory Process Clause of the Sixth Amendment, the Due Process clause of the Fourteenth Amendment to the United States Constitution, and Article I, Section 10 of the Ohio Constitution. (Tr. Trn. Vol. I, Pg. 225-226)

6. The trial court erred in overruling Appellant's motion for a mistrial when the state elicited testimony from two Columbus Police Officers that Appellant did not tell them how he cut his hand and that he did not tell them he was a victim of an assault and thus commenting on his constitutional right to remain silent, thereby violating Appellant's Fifth Amendment right to remain silent, and his right to Due Process under the Fourteenth Amendment. (Tr. Trn. Vol. II, Pg.13)

7. The trial court violated Appellant's right to Due Process as Guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution by entering verdicts of Guilty, as the jury's verdict was against the manifest weight of the evidence. (Tr. Trn. Vol. V, Pg. 132)

*Motion to Dismiss, Exhibits 12 and 13.* In a decision dated December 21, 2010, the Tenth District Court of Appeals overruled the assignments of error and affirmed Petitioner's conviction. *State v. Ambartsoumov*, 2010 WL 5385439 (Franklin Co. App. December 21, 2010).

On February 2, 2011, Petitioner, represented by new counsel, filed an appeal with the Ohio Supreme Court. In his memorandum in support of jurisdiction, he raised six propositions of law, as follows:

1. Appellant's right to present a defense was violated when the trial court refused to permit the defense to refute assertions by one of the State's key witnesses that he was an upstanding community leader and had never been involved in illicit activity.

2. Appellant's right to present a defense was violated when the trial court quashed Appellant's subpoena of a non-confidential criminal investigation that rebutted the State's characterizations of a witness' good character.

3. When the Appellant's subpoena of a non-confidential criminal investigation rebutting the State's characterizations of a witness' good character was quashed by the trial court it effectively denied Appellant the opportunity to prove that the Prosecution violated its disclosure duties under Crim. R.16 and Brady v. Maryland, 373 U.S. 83 (1963).

-3-

4. Appellant's right to present a defense was violated when the trial court refuse to permit the defendant to put on evidence concerning the State's witness' motive for fleeing the country.

5. A defendant's post arrest silence cannot be used as substantive evidence against him at trial. *Miranda v. Arizona*, 384 U.S. 436, 468 n. 37 (1966), followed.

6. In reviewing claims of whether a verdict is against the manifest weight of the evidence it is not relevant whether the jury is in the best position to consider inconsistencies in testimony because an appellate court sits as the thirteenth juror and may disagree with the fact-finder's resolution of the conflicting testimony. *State v.Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶25 followed .

On April 20, 2011, the Ohio Supreme Court dismissed the appeal as not involving any substantial constitutional question. *Motion to Dismiss, Exhibit 20.*

On March 17, 2011, Petitioner filed an application to reopen his direct appeal pursuant to Appellate Rule 26(B). In his application, he alleged that his appellate counsel was ineffective for failing to raise the following assignments of error:

1. Defense counsel rendered ineffective assistance when they failed to object to the admission of evidence concerning victim Tigran Safaryan's character during the prosecution's case-in-chief where the defendant had not yet put on his case or otherwise put on any evidence concerning the victim's character in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 1, pp.37-41).

2. The trial court erred when it allowed victim Safaryan to testify over objection why he was "cautious" of defendant Ambartsoumov in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 1, p. 71).

3. The trial court erred when it permitted Safaryan's cousin, Sabina Shvets, to testify over objection as to the reasons why Safaryan was cautious of Ambartsoumov in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United

-4-

States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 3, pp. 77-95).

4. The trial court erred to the prejudice of the defendants when it used the wrong standard in deciding the discoverability of materials sought by the defense under Crim. R.16(B)(1)(f) in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 1, pp. 100-101).

5. Defense counsel rendered ineffective assistance when they failed to object to the admission of evidence of the victim Arut Khoulian's character during the prosecution's case in chief where the defendant had not yet put on his case or otherwise put on any evidence concerning the victim's character in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 1, pp.119-122).

6. Defense counsel rendered ineffective assistance when they failed to cross-examine Tigran Safaryan about inconsistent statements he made to medical personnel concerning how the confrontation started that resulted in his wound in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 1, pp.105-113).

7. The trial court erred when it overruled the defense motion for a continuance to subpoena Tigran Safaryan in order to question him about statement he made to emergency room personnel in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 4, p. 29).

8. The trial court erred in refusing to allow the defense to play a video tape recording of Ambartsoumov's statement to the police in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 4, p. 56).

9. Trial counsel rendered ineffective assistance when they failed to

-5-

introduce during cross-examination of Detective Siniff portions of the interview with Ambartsoumov in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 2, pp.160-180).

10. Trial counsel rendered ineffective assistance when they failed to introduce, pursuant to Evid.R.801(D)(1)(b), Ambartsoumov's statement to the Detective Siniff indicating how he was cut the night of the incident in order to rebut the prosecution's charge against Ambartsoumov that he never explained to the police how he got cut during the incident in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 4, pp.56).

On December 6, 2011, the Tenth District Court of Appeals denied the application to re-open the appeal. *Motion to Dismiss, Exhibits 24 and 25.* Petitioner appealed this decision to the Ohio Supreme Court. *Id., Exhibit 26.* On March 21, 2012, the Ohio Supreme Court dismissed the appeal as not involving any substantial constitutional question. *Id., Exhibit 29.*

On April 18, 2012, Petitioner filed a motion for leave to file a delayed motion for a new trial in the Common Pleas Court of Franklin County, Ohio. *Motion to Dismiss, Exhibit 30.* On September 12, 2012, the trial court denied the motion, as amended, as untimely. *Id., Exhibit 35.* On October 10, 2012, Petitioner filed an appeal with the Tenth District Court of Appeals challenging the trial court's denial of this motion. *Id., Exhibits 36 and 38.* On July 11, 2013, the Court of Appeals affirmed the denial of leave to file a delayed motion for a new trial. (Doc. 18). By entry dated December 4, 2013, the Supreme Court of Ohio declined to accept jurisdiction of the appeal. *Id.*

Also on April 18, 2012, Petitioner, through counsel, timely presented his petition for a writ of habeas corpus to this Court. In his petition, he raised the following grounds for relief, stated here exactly as they appear in the petition:

Ground One:

-6-

Garri Ambartsoumov's right to present a defense was violated when the trial court refused to permit the defense to refute assertions by one of the State's key witnesses that he was an upstanding community leader and had never been involved in illicit activity.  The state court resolution of this ground was an unreasonable application of or contrary to United States Supreme Court precedent.

Ground Two:

Garri Ambartsoumov's right to present a defense was violated when the trial court quashed his subpoena of records concerning a non-confidential criminal investigation which rebutted the State's characterizations of a witness' good character.  The state court resolution of this ground was an unreasonable application of or contrary to United States Supreme Court precedent.

Ground Three:

When Garri Ambartsoumov's subpoena of a non-confidential criminal investigation rebutting the State's characterizations of a witness' good character was quashed by the trial court it effectively denied Ambartsoumov the opportunity to prove that the Prosecution violated its disclosure duties under *Brady v. Maryland*, 373 U.S. 83 (1963).  The state court resolution of this ground was an unreasonable application of or contrary to United States Supreme Court precedent.

Ground Four:

Garri Ambartsoumov's right to present a defense was violated when the trial court refused to permit the defendant to put on evidence concerning the State's witness' motive for fleeing the country.  The state court resolution of this ground was an unreasonable application of or contrary to United States Supreme Court precedent.

Ground Five:

Garri Ambartsoumov was denied due process and a fair trial when his post arrest silence was used as substantive evidence against him at trial.  The state court adjudication of this claim was an unreasonable application of or contrary to United States Supreme Court precedent.

Ground Six:

Garri Ambartsoumov was denied effective assistance of appellate counsel when his counsel failed to present the following issues on direct appeal:

      1.     Defense Counsel rendered ineffective assistance when they failed to object to the admission of evidence concerning victim Tigran Safaryan's character during the prosecution's case-in-chief where the defendant had not yet put on his case or otherwise put on any evidence concerning the victim's character in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 1, pp. 37-41).

      2.     The trial court erred when it allowed victim Safaryan to testify over objection why he was "cautious" of defendant Ambartsoumov in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 1, p. 71).

      3.     The trial court erred when it permitted Safaryan's cousin, Sabina Shvets, to testify over objection as to the reasons why Safaryan was cautious of Ambartsoumov in violation of defendants' rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution (TR. Vol. 3, pp. 77-95).

      4.     The trial court erred to the prejudice of the defendants when it used the wrong standard in deciding the discoverability of materials sought by the defense under Crim.R. 16(B)(1)(f) in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 1, pp. 100-101).

      5.     Defense Counsel rendered ineffective assistance when they failed to object to the admission of evidence of the victim Arut Khoulian's character during the prosecution's case in chief where the defendant had not yet put on his case or otherwise any evidence concerning the victim's character in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 1, pp.

-8-

119-122).

6.      Defense counsel rendered ineffective assistance when they failed to cross-examine Tigran Safaryan about inconsistent statements he made to medical personnel concerning how the confrontation started that resulted in his wound in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (TR. Vol. 1, pp. 105-113).

7.      The trial court erred when it overruled the defense motion for a continuance to subpoena Tigran Safaryan in order to question him about statement he made to emergency room personnel in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution.  (TR. Vol. 4, p. 29).

8.      The trial court erred in refusing to allow the defense to play a video tape recording of Ambartsoumov's statement to the police in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution.  (TR. Vol. 4, p. 56).

9.      Trial counsel rendered ineffective assistance when they failed to introduce during cross-examination of Detective Siniff portions of his interview with Ambartsoumov in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution.  (TR. Vol. 2, pp. 160-180).

10.      Trial counsel rendered ineffective assistance when they failed to introduce, pursuant to Evid.R. 801(D)(1)(b), Ambartsoumov's statement to the Detective Siniff indicating how he was cut the night of the incident in order to rebut the prosecution's charge against Ambartsoumov that he never explained t the police how he got cut during the incident in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution.  (TR. Vol. 4, p. 56).

The state court adjudication of this claim was an unreasonable application of or contrary to United States Supreme Court precedent.

Ground Seven:

      Garri Ambartsoumov was denied effective assistance of counsel when his counsel failed to investigate and present testimonial evidence that Alex Nercessian cut Arut Khoulian's neck and Armen Stepanyan cut Tigran Safaryan's arm.

Respondent moved to dismiss the petition because Petitioner had failed to exhaust state court remedies with respect to ground seven. (Doc. 8). On June 3, 2013, Petitioner amended his petition, omitting ground seven. (Doc. 12). Ground seven is now the focus of the motion for leave to amend (Doc. 17).

## II. FACTS

The facts of the underlying offense are stated in the state court of appeals' opinion. This is how the state court of appeals described the events which led to the filing of charges against Petitioner:

This case arose out of an incident on May 17, 2008, in which two individuals, Tigran Safaryan and Arut Koulian, sustained knife wound injuries outside a Columbus restaurant. On July 11, 2008, appellant and a co-defendant, Eldar Veliev, were each indicted on one count of felonious assault, in violation of R.C. 2903.11. On March 24, 2009, appellant and Veliev were also indicted on one count each of attempted murder, in violation of R.C. 2923.02 and 2903.02. The trial court subsequently granted the state's motion for joinder of appellant's trial with that of co-defendant Veliev, and the cases came for trial before a jury beginning August 24, 2009.

The first witness for the state was Safaryan, who was born in Azerbaijan and came to the United States at age 18. Safaryan owns seven area businesses, including three auto body shops and an auto glass company, employing over 60 individuals. Many of his customers are from Russia and the Armenian community. Safaryan and appellant were acquainted with each other, having met 12 years prior to the incident; appellant, a former hairdresser who now owns a body shop, was at one time Safaryan's barber. Safaryan is also acquainted with co-defendant Veliev.

Safaryan gave the following account of the events on May 17, 2008. Earlier that day, Alex Nercessian, a friend of Safaryan, made dinner reservations

at Hawa Russia, a Russian club located on East Dublin Granville Road, Columbus. Safaryan and a friend, Koulian, met Nercessian at the restaurant. Safaryan knew other individuals in attendance at the club that night, including Alexander Dashovsky. Appellant and Veliev were also at the restaurant.

Safaryan received a phone call shortly after arriving at the restaurant, and he stepped outside to a patio area to continue the conversation. Other individuals were also outside on the patio. As Safaryan finished the phone call, appellant, Veliev, and two other individuals came outside. Appellant started walking toward Safaryan, and Safaryan noticed "something black in his hand * * * like [a] knife." (Tr. Vol.I, 50.) Safaryan said to appellant: "[W]hat do you say to my cousin." (Tr. Vol.I, 50.) Appellant then slashed at Safaryan with a knife, striking toward Safaryan's upper body. Safaryan tried to block the attack with his right arm, but the knife cut across his right forearm. Just before the attack, Safaryan heard appellant say "kill" in Russian. (Tr. Vol.I, 80.) After being cut, Safaryan struck appellant "so I could get * * * out of the railing." (Tr. Vol.I, 52.) Appellant fell to one knee, and Safaryan tried to get away from the porch area.

At the time Safaryan first saw appellant come outside the restaurant, codefendant Veliev was walking behind appellant. Safaryan's friend, Koulian, was also outside at this time, standing in the vicinity of Veliev. During the incident, Safaryan observed a silver knife in Veliev's hand, and then saw "blood all over" Koulian's shirt. (Tr. Vol.I, 55.)

Following the altercation, Safaryan was assisted to the parking lot by Dashovsky, and someone placed a 911 call for an ambulance. Police officers arrived a short time later and ordered appellant to "stop and get on his knees," but "he wouldn't do that." (Tr. Vol.I, 60.) Safaryan testified that appellant was speaking in Russian, threatening him and his family; appellant "was yelling at us and said he would kill us." (Tr. Vol.I, 60.) Safaryan and Koulian were subsequently transported by ambulance to Grant Hospital. Safaryan was treated for a knife wound to his right arm of approximately ten inches in length, requiring stitches and staples.

At trial, Safaryan identified appellant as his assailant. Safaryan testified that appellant had threatened him several months before the incident. Safaryan learned of the threat from his cousin, Sabina Shvets, during a phone conversation. Safaryan later spoke to his attorney about the threats, but his attorney "told me to just let it go." (Tr. Vol.I, 74.)

-11-

On cross-examination, Safaryan stated he was aware that Nercessian had served five years in prison. Safaryan denied being in business with Nercessian. Safaryan further denied engaging in auto theft, trafficking in stolen vehicles, extortion or falsifying vehicle identification number tags.

Koulian, age 28, is formerly from Russia, and moved to Columbus in 2001. In May 2008, Koulian was self-employed as the owner of a jewelry store in Gahanna. Koulian, who was at the Hawa Russia restaurant with Safaryan and Nercessian on May 17, 2008, gave the following testimony regarding the incident. A short time after arriving at the restaurant, Koulian went outside to smoke. At first he did not see Safaryan, but Koulian then noticed a commotion to his right. Koulian "heard the yelling and I saw a knife pulled out, which Ty was struck on his right arm." (Tr. Vol.I, 129.) Appellant "was threatening. Something along the lines I will kill you." (Tr. Vol.I, 130.) Koulian described the knife in appellant's hand as approximately five or six inches in length with a dark handle and blade. Safaryan punched appellant and then retreated, and Koulian observed appellant "getting up * * * to his feet with the knife in his right hand." (Tr. Vol.I, 129.)

Koulian backed away from the scene, but another individual "was coming towards me. And I raised my arms * * * and I said, hey, stop, whatever is going on." (Tr. Vol.I, 129.) Koulian observed "something that resembled a medical scalpel" in the man's hand. (Tr. Vol.I, 129.) The individual shoved Koulian in the shoulder area; the man then pulled his hand back, and at that moment Koulian "saw blood coming down like crazy from my neck." (Tr. Vol.I, 130.) Someone pulled Koulian away, and Nercessian came outside to assist him. Koulian later learned that his assailant was an individual named "Eldar." At trial, Koulian identified co-defendant Eldar Veliev as his assailant.

The wound to Koulian's neck area was eight inches in length. Koulian experiences occasional numbness in the area of the wound, and he was informed by doctors that some nerve endings had been damaged.

Following the incident, appellant's sister visited Koulian's jewelry store, and she "basically told me * * * not to be dumb. I should be smarter than that and I should just get out of it and I shouldn't continue with this." (Tr. Vol.I, 180.) Koulian currently resides in Russia, and he "fled" the United States in September of 2008 after receiving "a threatening phone call" following his testimony during a grand jury proceeding. (Tr. Vol.I, 177.)

-12-

The caller told him: "You will die tonight." (Tr. Vol.I, 177.) Koulian immediately closed up his jewelry store and left the Columbus area; he drove to the Russian consulate in New York in a car he had taken for a test drive from a Columbus car dealership. After experiencing a delay in New York in obtaining necessary paperwork, a friend assured Koulian he could get the paperwork in California. Koulian traveled back to Ohio and then took a bus from Columbus to California. A short time later, he flew from Los Angeles to Russia. Koulian did not tell his wife or parents that he was leaving. He acknowledged there are pending charges against him for unauthorized use of the motor vehicle he drove to New York, and he denied any intent to steal the vehicle. On cross-examination, Koulian admitted he had been late in making rental payments on the leased jewelry store premises and that he had received eviction notices from the rental agency prior to leaving the country.

On the evening of May 17, 2008, Columbus Police Officer Matthew Ewing was dispatched to the Hawa Russia restaurant regarding a reported stabbing. When he arrived, Officer Ewing observed another officer struggling with a white male, later identified as appellant. The individual was "very loud, very boisterous." (Tr. Vol.II, 10.) The man was "very angry," and was "looking back to a couple of individuals in the crowd." (Tr. Vol.II, 10.) Officer Ewing noticed that the man was bleeding from a cut to the right hand area near the thumb. The officer described the wound as a "clean cut. It was a slit * * * on his right hand." (Tr. Vol.II, 13.) Appellant was eventually subdued and placed in a medic wagon, and Officer Ewing accompanied appellant to the hospital. Officer Ewing testified that appellant "just basically ranted and raved about how he was disrespected in the club or disrespected with his business or something." (Tr. Vol.II, 14.) Appellant told the officer that he was an "important person" who owned businesses and had a "lot of money." (Tr. Vol.II, 15.)

Columbus Police Officer Heath Graber was also dispatched to the Hawa Russia restaurant on May 17, 2008. Appellant was placed in a medical ambulance, and Officer Graber followed the ambulance to the hospital; upon arrival, Officer Graber accompanied the medics and appellant inside the hospital, and the officer noticed a deep cut to appellant's right thumb area.

Dashovsky, age 24, was born in the former Soviet Union and came with his family to the United States in 1989. Dashovsky is employed as a sales manager at Safaryan's auto glass business, and he is acquainted with

Koulian. Dashovsky has known appellant for a number of years; at one time, appellant was Dashovsky's hairdresser. Dashovsky was also familiar with Veliev, who works at appellant's body shop.

On the night of the incident, Dashovsky was at the Hawa Russia restaurant for a birthday party. When he arrived, appellant and Veliev were at the restaurant. Later, Safaryan and Koulian entered the restaurant. At some point in the evening, Safaryan got up from his table and went outside to smoke. Appellant then got up from his table and went to the bathroom. Dashovsky went outside to smoke; as he was walking toward the door, Dashovsky observed appellant pass a knife to Veliev. The knife had a black handle and was "foldable." (Tr. Vol.II, 86.) Dashovsky recognized the knife "from when Garri used to cut hair." (Tr. Vol.II, 86.)

As Dashovsky walked outside he observed Safaryan "walking away, holding his arm." (Tr. Vol.II, 87.) Dashovsky then noticed that Safaryan was bleeding from a cut. Safaryan's arm was "severely cut down to the veins." (Tr. Vol.II, 87.) Dashovsky made a tourniquet out of a shirt for Safaryan's arm. He then heard Koulian yelling "I got cut, I got cut." (Tr. Vol.II, 87.) Koulian suffered a cut to the throat area, and Dashovsky ran to the kitchen and grabbed some towels and blankets. Dashovsky turned his attention to Safaryan "because I honestly didn't think Arut would make it." (Tr. Vol.II, 88.) Dashovsky made a 911 call for help. Appellant and Veliev went back inside the restaurant. Dashovsky did not observe either appellant or Veliev being hit or punched during the incident. At trial, the state played a recording of the 911 call placed by Dashovsky, in which he told the dispatcher that one of the assailants was "Armenian descent, first name Garri." (Tr. Vol.II, 96.)

Dmitry Semikin, who was at the Hawa Russia restaurant on May 17, 2008, testified that he was standing outside the restaurant when he heard screams. He observed approximately 10 to 15 individuals near the entrance of the restaurant. Semikin saw a knife in appellant's hand, and "Tigran's arm was already cut and he was holding it with another hand." (Tr. Vol.III, 19.) He also "saw that Tigran punched Garri." (Tr. Vol.III, 19.) Semikin observed Koulian "holding his neck, which was bleeding." (Tr. Vol .III, 21.) Veliev was standing across from Koulian at the time. Semikin went to help Koulian; Semikin later realized that he had also been cut. When appellant was taken into custody by police he was making "[h]is usual threats, that he will kill everybody and he will avenge everybody." (Tr. Vol.III, 25.)

-14-

Columbus Police Officer Mark Marstiller was dispatched to the scene that evening and he attempted to locate witnesses. Although there were a number of individuals at the restaurant, "there was no cooperation. Nobody really wanted to be involved and talk to me specifically about anything." (Tr. Vol.II, 110.)

Columbus Police Detective Glenn Siniff went to the hospital on the night of the incident and spoke with Safaryan. He also interviewed appellant that evening. The following day, Detective Siniff interviewed Koulian, who named the individual that cut his throat. Koulian picked out Veliev's picture from a photo array. Detective Siniff also spoke with Semikin, who identified Veliev as being involved in the incident.

Shvets, age 20, is a cousin of Safaryan. In September 2007, Shvets was at a Columbus restaurant when appellant approached her and asked where she was from. Shvets responded that she was from Bakul, Azerbaijan. Shvets told appellant that she was related to Safaryan. When appellant heard Safaryan's name "he got mad and he started saying that he hates him, that he's going to kill his son, his family." (Tr. Vol.III, 82.) After appellant left, Shvets called Safaryan and asked him to come pick her up. She was very upset at the time. Appellant once told Shvets: "I'm the king of the city, and if I don't like someone, I'm going to kill the person." (Tr. Vol.III, 84.)

Aydin Gasanov, appellant's father-in-law, was called as a witness by the defense. Gasanov was at the Hawa Russia restaurant on the evening of May 17, 2008, and gave the following account. During the evening, appellant and Veliev got up from their table; a short time later, Safaryan, Koulian, Nercessian, and several other individuals went outside to smoke. Gasanov later heard someone screaming and he ran outside. Veliev was lying on the floor and appellant "was on his knees, trying to get up. And in those 9 or 10 people-I'm not sure how many exactly-they were beating Garri and Eldar with their feet." (Tr. Vol.IV, 35-36.) Gasanov attempted to stop the fight; appellant and Veliev eventually went back inside the restaurant, and Gasanov followed them.

Appellant, age 45, testified on his own behalf. Appellant was born in Bakul, Azerbaijan, part of the ex-Soviet Union, and he graduated from National Beauty Academy after moving to the United States. Appellant, who currently owns a body shop, has known Safaryan for 15 years; he has known Veliev for 12 years.

-15-

On May 17, 2008, appellant was invited to dinner at the Hawa Russia restaurant by a friend, Dimitri Zubrich. Other friends and relatives of appellant were also in attendance. Koulian, Safaryan, and Nercessian subsequently arrived at the restaurant. That evening, appellant went to the restroom and then went outside with Veliev to smoke. While they were standing outside, Safaryan, Koulian, and Nercessian "started coming closer." (Tr. Vol.IV, 68.) As the other men approached, "Ty says I want to talk to you." (Tr. Vol.IV, 69.) Appellant testified that he told Safaryan that he was with family and "I don't want any problems." (Tr. Vol.IV, 69.) Safaryan then "smacked me twice. And I walked back and tried to go, and he hit me." (Tr. Vol.IV, 69.) After being hit twice, appellant "hit [Safaryan] back." (Tr. Vol.IV, 69.) Safaryan hit appellant a third time and appellant fell down. When appellant fell down, he "tried to push this guy. I get * * * cut very badly." (Tr. Vol.IV, 70.) Appellant's father-in-law walked outside and started to push the other men, and appellant went back inside the restaurant.

A short time later, when the police arrived, appellant refused a police officer's order to get on his knees. Appellant told the officer to "cuff me" instead. (Tr. Vol.IV, 72 .) The officer then used a Taser gun on him. Appellant denied having a knife that evening or slashing Safaryan's arm. He also denied observing a knife in Veliev's hand.

Zubrich, who invited appellant to the Hawa Russia restaurant on the night of the events at issue, gave the following testimony. According to Zubrich, "everybody knows that Tigran doesn't like Garri and has been trying to get him for something." (Tr. Vol.IV, 151.) That evening, appellant and Veliev went outside to smoke, and the individuals at the table where Safaryan was seated got up and also went outside. Zubrich observed Safaryan hit appellant. Zubrich did not want to get involved, so he went back to the table to be with his girlfriend. A short time later, appellant, Veliev, and appellant's father-in-law came back inside the restaurant, and Zubrich heard sirens. Zubrich also observed five or six individuals running inside the restaurant from the front door toward the back kitchen door.

*State v. Ambartsoumov*, supra, at **1-6.

### III.  LEGAL STANDARD

The provisions of the Antiterrorism and Effective Death Penalty Act, Pub.L.

104-132, 110 Stat. 1214 (AEDPA) govern the scope of this Court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001); *Wilson v. Parker*, 515 F.3d 682, 691 (6th Cir. 2008). AEDPA imposes a "highly deferential standard for evaluating state-court rulings," Lindh v. Murphy, 521 U.S. 320, 333, n. 7 (1997), and "demands that state-court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). *Renico v. Lett*, 130 S.Ct. 1855, 1862 (2010)(footnote omitted) .

When the claims presented in a habeas corpus petition have been presented to and decided by the state courts, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence that was presented. 28 U.S.C. §2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

>  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

>  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding

In applying this statute, the Supreme Court has held that "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002). To obtain habeas corpus relief, a Petitioner must show the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Bobby v. Dixon*, 132 S.Ct. 26, 27 (2011), *quoting Harrington v. Richter*, 562

U.S. ––––, ––––, 131 S.Ct. 770, 786–87 (2011). This bar is "difficult to meet" because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 131 S.Ct. at 786, *quoting Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979) (Stevens, J., concurring in judgment)). In short, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.*, *quoting Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

In situations where the state courts have not adjudicated the merits of a claim, a federal habeas court should review a Petitioner's claim de novo. *Howard v. Bouchard*, 405 U.S. 459, 467 (6th Cir. 2005) ("Where the state court has not addressed or resolved claims based on federal law, most courts, including this one, have held that the decision is not an 'adjudication on the merits.' Thus, a federal habeas court reviews such unaddressed claims de novo."); *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir.2003) (reviewing habeas Petitioner's sufficiency-of-the-evidence claim de novo where the state courts had considered the admissibility of the evidence but not the sufficiency of the evidence); *Pennington v. Jones*, 2006 WL 322474, at *2 (E.D.Mich. Feb. 10, 2006) (unpublished) (reviewing habeas Petitioner's claim de novo where he raised it for the first time in his petition).

Questions of state law are not reviewable in a federal habeas action. *See Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law. Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.") (citations and internal quotation marks omitted). Petitioner instead must show that "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see also Estelle*, 502 U.S. at 68, 112 S.Ct. 475 ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United

States."). Accordingly, the Sixth Circuit has held that "[e]rrors by a state court in the admission of evidence are not cognizable in habeas corpus proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir.1994).

## IV. MERITS REVIEW

### A. GROUNDS ONE, TWO AND FOUR

Petitioner presents three grounds for relief attacking various trial court evidentiary rulings and claims that these rulings violated his right to present a complete defense. All of these claims relate to the trial court's exclusion of extrinsic or impeachment evidence which Petitioner contends was necessary to refute the testimony of two of the state's primary witnesses, Mr. Safaryan, Petitioner's alleged victim, and Mr. Koulian, the alleged victim of Petitioner's co-defendant . For example, in his first ground Petitioner claims that the trial court erred by refusing to allow testimony from former law enforcement officials regarding a task force criminal investigation . According to Petitioner, this testimony would have rebutted assertions by Mr. Safaryan that Mr. Safaryan was an upstanding community leader who did not engage in illicit activity. Defense counsel made a proffer of this proposed testimony on the record. Tr. Vol IV pp. 186-190. Further, in his second ground, Petitioner contends that the trial court erred in excluding the admission of an investigative report from a task force initiated in 1999 or 2000 which Petitioner asserts would have demonstrated Mr. Safaryan's involvement in illicit business activities. Significant discussion surrounding this report was had on the record following the direct examination of Mr. Safaryan. Tr. Vol I, pp. 82-105. Additionally, in his third ground, Petitioner claims that the trial court erred in refusing to permit him to put on extrinsic evidence regarding Mr. Koulian's motive for fleeing the country. Petitioner contends that the extrinsic evidence would have demonstrated that Mr. Koulian fled the country because he was having financial problems, not because he had been threatened by Petitioner's family. Specifically,

Petitioner sought to introduce testimony from the attorney and property manager from Gahanna Creekside Investments, the company that leased Mr. Koulian space for his jewelry store.   Tr. Vol I, pp.  225-229.

Certainly, to the extent these claims address issues of state evidentiary law, they are not subject to collateral review.  "Habeas review does not encompass state court rulings on the admission of evidence unless there is a constitutional violation." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994).   Consequently, the Court's review is limited to whether Petitioner can demonstrate a violation of his federal constitutional rights.  *Haliym v. Mitchell*, 492 F.3d 680, 700 (6th Cir. 2007).  Here, Petitioner has sought to elevate his claims to a constitutional level by contending that the trial court's evidentiary rulings outlined above violated his right to present a complete defense under the Sixth Amendment.

The Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986).  This right ensures a defendant's opportunity to present witnesses in his defense.  *See Taylor v. Illinois*, 484 U.S. 400, 409 (1988). However, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor*, 484 U.S. at 410; *Rockwell v. Yukins*, 341 F.3d 507 (6th Cir.2003). The Supreme Court has made it clear that the right to present a "complete" defense is not an unlimited right to ride roughshod over reasonable evidentiary restrictions.  *Rockwell*, at 512.

Criminal defendants "must comply with established rules of procedure and evidence designed to assure fairness and reliability in the ascertainment of guilt and innocence." *United States v. Cruse*, 59 Fed. Appx. 72, 79 (6th Cir. 2003) *quoting Chambers v. Mississippi,* 410 U.S. 284, 302(1973). The application of "[s]uch rules do[es] not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." *Cruse*, 59 Fed. Appx. at 79–80. Whether a decision to exclude certain evidence or preclude questioning about a

particular matter violates a criminal defendant's constitutional right to present a defense "turns on the extent to which that evidence is so highly relevant that it becomes indispensable to the success of the defense."*Crane*, 476 U.S. at 691. Against such considerations courts must balance the state's interests in enforcing the evidentiary rule on which the exclusion was based. The question for the Court to consider is whether Petitioner was afforded 'a meaningful opportunity to present a complete defense.' " *Crane*, 476 U.S. at 690 *quoting California v. Trombetta*, 467 U.S. 479, 485 (1984).

As the United States Supreme Court has recognized, "[o]nly rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 133 S.Ct. 1990, 1992 (2013). Cases in which the Supreme Court has declared the exclusion of evidence unconstitutional found that the exclusion "significantly undermined fundamental elements of the defendant's defense." *United States v. Scheffer*, 523 U.S. 303, 317 (1998).

The Tenth District Court of Appeals did not address any of these claims as a violation of Petitioner's right to present a complete defense. Rather, the appellate court analyzed Petitioner's claims as appealing the trial court's evidentiary rulings. This is so even though, at least with respect to Claims One and Two, Petitioner cited federal law and argued the issue in terms of various constitutional rights. With respect to Claim Four, Petitioner's assignment of error before the state appellate court was phrased in terms of the Sixth and Fourteenth Amendments but his argument did not directly address these principles. In analyzing Petitioner's first ground, the appellate court relied on Ohio Rule of Evidence 403 and found that the trial court was within its discretion to exclude the testimony from various law enforcement officers as to Mr. Safaryan's alleged criminal activity to avoid conducting a "trial within a trial" as well as to avoid confusion and delay. Similarly, with respect to Petitioner's second ground, the appellate court found that the trial court had not abused its discretion under Rule 403 in excluding a nearly ten-year-old investigatory report. Finally, the appellate court found the trial court properly exercised its discretion in excluding testimony on behalf of

-21-

Gahanna Creekside Investments regarding Mr. Koulian under Rule 403 on grounds of confusion.

Because the state court did not review the merits of Petitioner's constitutional claims, AEDPA deference does not apply and this Court is required to conduct a de novo review of questions of law and clear error review of factual determinations. *Couturier v. Vasbinder*, 385 Fed.Appx. 509, 516 (6th Cir. 2010); *see also Ambrose v. Booker*, 684 F.3d 638 (6th Cir. 2010).

With respect to his first and second claims, Petitioner contended on appeal that both the testimony of former law enforcement officers and a criminal investigation report were necessary to rebut the testimony of Mr. Safaryan that he never engaged in criminal activity. Petitioner also suggests that testimony about Mr. Safaryan's illicit business activity would have demonstrated that Petitioner had no motive to be jealous of Mr. Safaryan's business accomplishments. As Petitioner portrays it, at trial the prosecution "touted" Mr. Safaryan's business accomplishments, including his receipt of a governor's award.

In reviewing the record, the Court concludes that the prosecution did not devote much time to Mr. Safaryan's business accomplishments in direct examination. Rather, the prosecution asked a handful of questions about his accomplishments as background information and only elicited testimony about a governor's award in response to defense counsel's questioning on cross-examination. *See* Tr. Vol I, pp. 38, 115. Further, on cross-examination, defense counsel was able to raise the specter of his involvement in illicit activities by questioning Mr. Safaryan as to whether he had any involvement in auto theft or flipping or falsifying VIN tags. *See* Tr. Vol. I, p. 111.

As for the issue of Petitioner's potential jealousy, Petitioner's own testimony demonstrates his view of both Mr. Safaryan and Mr. Safaryan's business accomplishments. For example, Petitioner testified that Mr. Safaryan operates a cash business whereas Petitioner's clients pay by check and he files a tax return, Petitioner has relationships with insurance companies while Mr. Safaryan does not, Mr. Safaryan

has many businesses and employees but that does not mean he is successful, he has no respect for Mr. Safaryan, and he saved Mr. Safaryan's life but Mr. Safaryan "spit in [his] face." Tr. Vol. IV pp. 118-120.

With respect to Petitioner's fourth claim regarding the exclusion of extrinsic evidence of Mr. Koulian's motives for fleeing the country, Petitioner sought to call the attorney and property manager for Gahanna Creekside Investments, the management company leasing the space for Mr. Koulian's jewelry store. On appeal, Petitioner contended that this testimony would have revealed that Mr. Koulian's business was in financial distress and would have refuted Mr. Koulian's testimony that he had no contact with anyone in Columbus. While this testimony was not allowed, Mr. Koulian was cross-examined as to whether he portrayed his business entity as a limited liability corporation rather than a sole proprietorship, whether he was behind in rental payments prior to leaving the country, and whether his father removed any inventory from the store after Mr. Koulian left Columbus. Tr. Vol. I, pp. 198, 203, 204-207.

Taking all above into account, the trial court's rulings did not violate Petitioner's constitutional rights or deny him a fair trial. Petitioner had a meaningful opportunity to present a defense and the Court is not persuaded that any of this extrinsic evidence would have added to or refuted the testimony already in the record in any significant way. Rather, as the trial court found, all of this evidence had the potential to create confusion and delay by shifting the jury's attention to collateral issues unrelated to the events of the incident on May 17, 2008.

Moreover, the exclusions of this extrinsic evidence were harmless under the strict standard applicable in federal habeas cases. *See Fleming v. Metrish*, 556 F.3d 520, 536-37 (6th Cir. 2009) (right to present a defense is subject to a harmless error analysis). On federal habeas review, the harmless-error standard is whether the violation "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Habeas courts must apply this standard regardless of the harmless-error standard applied by the state court or whether the state court

-23-

undertook harmless error review at all. *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007).  As explained above, defense counsel was afforded the opportunity to cross-examine Mr. Safaryan and Mr. Koulian in such as way as to raise issues regarding their credibility , the prosecution made only limited references to Mr. Safaryan's accomplishments, and Petitioner testified about his perception of Mr. Safaryan.  As a result, the exclusion of this evidence did not have a substantial and injurious effect or influence on the jury's verdict.   Consequently, Petitioner is not entitled to habeas relief on these grounds.

## B.  GROUND THREE

Petitioner's third claim relates to the investigative report which formed the basis of his second claim.  As Petitioner raises this claim here, his opportunity to prove that the prosecution violated its duties under *Brady v. Maryland*, 373 U.S. 83 (1963), was violated when the trial court quashed the subpoena fo the non-confidential report of the criminal investigation which would have rebutted the State's characterizations of Mr. Sarafyan's good character.   This claim was raised on direct appeal as follows:

> The trial court improperly quashed Appellant's subpoena of a non-confidential criminal investigation that rebutted the State's characterizations of an alleged victim's good character, thereby violating the Due Process clause of the Fourteenth Amendment and comparable provisions of the Ohio Constitution.

Petitioner's argument in his state appellate brief is set forth in its entirety as follows:

> The Due Process Clause of the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution require the prosecuting attorney to disclose all evidence that is "favorable" to the accused and "material" to issues of guilt or punishment.  *Brady v. Maryland* (1963), 373 U.S. 83, 87; *United States v. Agurs* (1976), 427 U.S. 97; *State v. Johnson* (1988), 39 Ohio St.3d 48.  Crim R. 16(A)(1)(f) sets forth similar mandates.
>
> As to the first requirement under *Brady*, the term "favorable" is defined broadly.  Many forms of evidence qualify as exculpatory or "favorable."  The Supreme Court has recognized that *Brady* encompasses

-24-

evidence and information that may be used to impeach prosecution witnesses.  *Giglio v. United States* (1972), 405 U.S. 150, 154-55 (holding that promises for favorable treatment and plea agreements must be disclosed); *see also United States v. Bagley* (1985), 473 U.S. 667, 682 (holding that impeachment evidence as well as exculpatory evidence is subject to disclosure and no distinction should be made with respect to the constitutional disclosure mandates).  Favorable evidence also includes information that may not be favorable as it stands alone, but constitutes the "tip of the iceberg" and would lead to additional favorable evidence: "The duty of disclosure under *Brady* extend[s] not only to the [prosecution's] knowledge of concrete exculpatory information, but also to facts from which other exculpatory information could be inferred, i.e., facts which could constitute the 'tip of the iceberg' of other *Brady* evidence." *United States v. Burnside* (N.D. Ill. 1993), 824 F.Supp. 1215, 1258 (quoting *United States v. Shaffer* (9th Cir. 1986), 789 F.2d 682, 690-91)).

      With respect to the second requirement under *Brady*, evidence is "material" is there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley* (1985), 473 U.S. 667, 682.  A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 682.  Materiality is not affected by the fact that evidence is arguably cumulative: "the fact that other impeachment evidence was available to defense counsel does not render additional impeachment evidence immaterial." *United States v. Smith* (1996), 77 F.3d 511, 515 (rejecting prosecuting attorney's argument that additional impeachment evidence was immaterial and cumulative due to existence of other impeachment evidence).

      Defense counsel suspected the existence of *Brady* material for months.  The documents sought by the subpoena were information sought by defense counsel for months.  The State continuously told counsel and the court these documents did not exist.  (Tr. Trn. Vo., I, Pg. 89-90). Through independent investigation and a subpoena, the defense found this exculpatory information but was denied access to it.  Even if this information were not itself admissible in court, it was the "tip of the iceberg" information recognized in *Burnside*.  These documents may have led to impeachment material.  Therefore, the evidence should have been disclosed under *Brady*.

Petitioner seems to have rephrased his claim slightly for purposes of his habeas

petition, tweaking it to suggest not that a *Brady* violation occurred, but that the trial
court foreclosed his opportunity to demonstrate that such a violation occurred.   Despite
Petitioner's characterization here that he was prevented from proving a *Brady* violation,
both the trial court and the state appellate court evaluated the investigative report
under the *Brady* standard and independently concluded, based on a review of the
material contained in the report, that no such violation occurred.

As set forth in great detail by the state appellate court, the trial court addressed
the issue of the disclosure of the report as follows:

> By way of background, on August 24, 2009, shortly prior to the start of
> trial, the trial court addressed a motion to compel discovery and/or
> exculpatory evidence filed by counsel for appellant.  Counsel argued that
> several of the state's witnesses "are heavily steeped in criminal activity,
> including Nercessian who was in prison.". (Tr. Vol. I, 8). Counsel for
> co-defendant Veliev joined in the motion.  In response, the prosecution
> argued there was no "[Brady] information" regarding Safaryan, Nercessian
> or Koulian (Tr. Vol. I, 10). Also on that date, counsel for appellant filed a
> subpoena with the Organized Crime Investigations Commission Task
> Force (via the office of the Ohio Attorney General)
>
> The next morning, August 25, 2009, the trial court addressed the filing of
> the subpoena, at which time counsel for co-defendant Veliev joined in
> appellant's subpoena motion. The court informed the parties:  "The state's
> lawyers have advised me that the office of the attorney general wants to
> move to quash the subpoena on the argument that it is confidential,
> investigative material,  and that the prosecuting attorney of Franklin
> County does not have access to this material.". (Tr. Vol.1, 14.)
>
> Following the start of trial, the trial court, outside the presence of the
> jurors, again addressed the issue of the subpoenaed documents.  The
> prosecutor noted on the record "After speaking with some people, it
> seems as though the documents that have been requested are not
> confidential, as this was a closed case." "(Tr. Vol. I, 86).  The trial court
> questioned Jerry Maloon, an assistant attorney general, who had
> conducted a search for the requested documents.  Maloon had located
> several old administrative files, but stated that the task force "has been
> over for at least five years."and that "[t]he vast majority -- I'm going to say

99.99 percent of any and all documentation having to do with this task force of Organized Crime has been destroyed per our record retention policies." (Tr. Vol. I, 87-88) Maloon noted that, pursuant to a document dated October 12, 1999, a task force had been initiated in 2000.

Maloon searched for the names in the subpoena (Safaryan, Koulian, and Nercessian) and stated that "Nercessian is the subject of a Dispatch article, January 17th, 2003, talking about a drug ring, and it looks like he got 30 months' incarceration at the federal level for that." (Tr. Vol. I, 88-89.) Maloon also found "the proposal from the CPD detective *** that was dated October 12th, 1999." (Tr. Vol. I, 89) Maloon requested that the trial court conduct an in camera review of the documents, stating: "There is a great deal of sensitive information in the proposal." (Tr. Vol. I, 89) Maloon further represented: In my review of that material *** [t]here's not one shred of evidence in there as to Ty*** Safyran's criminal conduct. It's just not there. I know what they're looking for." (TR. Vol. I, 100.)

The trial court conducted an in camera review of the documents. Following its review, the court noted that the documents included a photocopy of an article from the Columbus Dispatch, dated January 17, 2003, entitled 'Drug Ring Operated at Club, 'that appears to reflect a conviction in the federal district court, and Mr Nercessian is reflected in this article as, quote, who is in jail and is expected to plead guilty to his role in the ring next month, unquote" (Tr. Vol. I, 90-91.) The trial court indicated it would allow defense counsel to have a copy of that article.

The trial court noted that the "other document that I've been provided *** is entitled summary investigation in to Russian émigré criminal activity in the Columbus area prepared October 12, 1999, and then there's what I understand from counsel to be a Columbus Police officer listed as the author." (Tr. Vol. I, 91) The court related that the document contained various unnumbered pages, of which the following subheadings are included: Auto thefts, insurance frauds, body shop frauds, odometer frauds, title frauds, other frauds, tax fraud. Exceptions, drug trafficking, prostitution, organized crime connections." (Tr. Vol , 91) The court indicated that the document also included a "two-page list entitled Índividuals Involved'with some phone numbers and purported information about their employment. There look to be 20 or so individuals listed" (Tr. Vol. 1, 92) Further, the document included "four pages of *** businesses involved." (Tr. Vol. I. 92) The last pages of the document included a USA Today newspaper article dated August 24,

-27-

1999, as well as a 1998 U.S. News and World Report cover story. "Dirty Diamonds. How the FBI and some honest Moscow cops broke up a ring that was looting tons of gold and gems from the Russian National Treasury" (Tr. Vol. I, 92)

The trial court concluded: I do not believe that under [*Brady*] that any of this material is subject to being turned over" (Tr. Vol. I, 93.) The trial court made clear it was providing some of the information, and that "the only thing I'm not giving you is the summary of investigation by police officers 10 years ago." (Tr. Vol. I, 95) Defense counsel argued, however, that the investigative report should be turned over to refute Safaryan's suggestion that he was a legitimate businessman. The trial court noted that the issue of admissibility was "really a 403 issue for "me," and "that it's terribly prejudicial and confuses the issues and does not have any focus on what we're here to talk about." (Tr. Vol. I, 96) The court reiterated its view that the documents did not contain "[*Brady*] material." (Tr. Vol. I, 99).

When addressing the issue of a *Brady* violation as raised by Petitioner on appeal,

the state appellate court stated as follows:

Appellant further argues that the trial court's ruling may have prevented the defense from obtaining *Brady* material. Appellant contends that the court's ruling resulted in prejudice because (1) the documents may have been useful as a tool to refute Safaryan's characterizations as a legitimate businessman, and (2) the documents may have been the "tip of the iceberg"for other relevant and exculpatory evidence.

In general, R.C. `149.43 establishes "a statutory right of access to public records and the procedure for exercising that right." *State v. Lawson*, 11th Dist. No. 2001-L-071, 2002-Ohio-5605, 30. Pursuant to that statute, a "public record does not include confidential law enforcement investigatory records."' *Id*. quoting R.C. 149.43 (A)(1)(h).

The state argues that the materials at issue were not withheld by the prosecution, and that the trial court never specifically reached a determination whether of not the records were confidential; rather, the trial court conducted an independent review of the records and determined that some of the information in the records was not admissible, and that the records contained no *Brady* material. The record supports the state's contention that the trial court did not make a determination as to confidentiality of the documents under R.C. 149.43 but, instead, the court reviewed the materials in camera and concluded

-28-

they did not contain *Brady* material and were not relevant to the issues
before the jury.

There are three components to a *Brady* violation.  "[T]he evidence at issue
must be favorable to the accused, either because it is exculpatory, or
because it is impeaching, that evidence must have been suppressed by the
State, either willfully or inadvertently, and prejudice must have ensued.
*Strickler v. Greene* (1999), 527 U.S.  263, 281-82, 119 S.Ct. 1936, 1948.

The sealed investigative task force report which the trial court reviewed is
part of the record before this court, and we have reviewed that record to
determine whether there is any support for appellant's assertion that a
*Brady* error may have occurred as a result of the failure to provide that
information.  Having conducted our own independent review of the
report, we are satisfied that there is nothing contained in that report which
would have altered the jury verdicts, nor do we find error with the trial
court's determination that the report did not contain material required to
be disclosed under *Brady.  State v. Lawson* (June 4, 1990 ), 12 Dist. No.
CA88-05-044 (appellate court's own review of sealed materials found no
violation of *Brady* rule and no materials that could have affected outcome
of trial.

To the extent that Petitioner raises a *Brady* claim, as the state courts explained,

there are three essential components of a *Brady* violation: (1) evidence at issue must be

favorable to the accused because it is exculpatory or impeaching; (2) evidence must

have been willfully or inadvertently suppressed by the State; and (3) prejudice ensued.

*See Strickler v. Greene*, 527 U.S. 263, 282–83 (1999).  The duty to disclose information

under the *Brady* rule encompasses both exculpatory and impeachment evidence. *See id.*,

527 U.S. at 280; *U.S. v. Bagley*, 473 U.S. 667, 676 (1985); *Kyles v. Whitley*, 514 U.S. 419, 433

(1995); *United States v. Mullins*, 22 F.3d 1365, 1372 (6th Cir. 1994). Exculpatory evidence

is that which is favorable to the accused and "if disclosed and used effectively, [ ] may

make the difference between conviction and acquittal." *Bagley*, 473 U.S. at 676. *See also*

*United States v. Presser*, 844 F.2d 1275, 1278 (6th Cir.1988).  "Such evidence is material 'if

there is a reasonable probability that, had the evidence been disclosed to the defense,

the result of the proceeding would have been different.'" *Strickler*, 527 U.S. at 280

*quoting Bagley,* 473 U.S. 682.

The information at issue here was not exculpatory in the sense that it demonstrated Petitioner's innocence. Rather, defense counsel sought the report to impeach the credibility of Mr. Safaryan. While this information was sealed and made part of the state court record, this sealed information is not part of the record before this Court. Although the Court has requested that the record be supplemented to include this sealed information, Respondent has been unable to locate it. However, the state court record does contain a fairly thorough explanation of the information contained in the investigative report.

Significantly, Petitioner has not demonstrated the materiality of the information contained in the report. That is, Petitioner has not shown a reasonable probability that the result of the trial would have been different had the trial court provided Petitioner access to the complete report. As set forth above, the state appellate court noted that the age of the report and the failure of the report to result in any charges against Mr. Safaryan supported its exclusion under state evidentiary rules. Further, the testimony of the custodian of the report indicated that Mr. Safaryan was not a subject of the investigation report. Additionally, as explained above in connection with Petitioner's other claims, Petitioner's counsel was able to cross-examine Mr. Sarafyan regarding his alleged involvement in illicit activities.

Moreover, Petitioner's suggestion that his access to the report could have led to the discovery of *Brady* material is nothing more than speculation. "Allegations that are purely speculative cannot support a *Brady* claim." *Stockman v. Berghuis*, 2013 WL 6885121, *11 (E.D. Mich. Dec. 31, 2013) *citing Burns v. Lafler*, 328 F.Supp.2d 711, 724 (E.D. Mich. 2004); *see also United States v. Driscoll*, 970 F.2d 1472, 1482 (6th Cir. 1992) *abrogated on other grounds by Hampton v. United States*, 191 F.3d 695 (6th Cir. 1999). Further, "a federal court's conclusions that such inadmissible material would 'lead' to admissible, exculpatory evidence cannot be based on 'speculation with slight support.'" *Wogenstahl v. Mitchell*, 668 F.3d 307, 325, n. 3 (6th Cir. 2012) *quoting Wood v. Bartholomew*, 516 U.S. 1, 8

(1995).  For all of these reasons, Petitioner cannot succeed on any *Brady* claim because he has not demonstrated the materiality of the information in the report or how he was prejudiced by its alleged suppression.

To the extent that Petitioner, through his framing of his *Brady* claim here, is trying to suggest a violation of his right to present a full defense, any such claim also fails. As explained above in connection with his other claims, Petitioner had a meaningful opportunity to present a defense and the Court is not persuaded that any evidence regarding a ten-year old investigation not even directed to Mr. Safaryan would have refuted his testimony in any significant way.  Moreover, under a harmless error analysis, the exclusion of this evidence cannot be found to have had a substantial and injurious effect or influence on the jury's verdict.  Rather, as previously discussed, defense counsel was afforded the opportunity to cross-examine Mr. Safaryan in such a way as to raise issues regarding his credibility.  Consequently, Petitioner's fourth claim fails on its merits.

## C.  GROUND FIVE

Petitioner's fifth claim is that his due process rights and his right to a fair trial were violated when his post arrest silence was used as substantive evidence against him at trial.  Specifically, Petitioner argues that the state's questioning of Officers Ewing and Graber elicited responses commenting on Petitioner's right to remain silent.

Officer Ewing testified, in relevant part, as follows:

> Q.    ... So, officer, whenever – do you ride – you ride with the
>        defendant to the hospital.  Does the defendant start speaking
>        to you at any point:
> A.    Oh, yes.
> Q.    And what sort of – if you recall, what sort of things is the
>        defendant saying?
> A.    Again, he was very, very angry at people at the club, outside
>        the club.   Again, he very much talked.  He was very much,
>        you know, didn't – I, of course, didn't ask him any questions,
>        basically because we're kind of taught not to do that.
>        ...

Q.      Thank you.  Did he ever – did he ever explain how he hurt his hand?

A.      No, I asked him a number of times even.  You know, that's the first thing the medics asked.  That's the first thing that the nurses and doctors asked when they came in to the ER there at St. Ann's.  He could never explain how he cut –

On cross-examination, Officer Ewing testified:

Q.      So when [the prosecutor] was asking about did he tell you how he cut his thumb, she was asking you basically about what he didn't say or did say, correct?  In the ambulance, remember she asked about that, that whole line of questions about his thumb and did he say how it was cut?

A.      Oh, right.

Q.      So you weren't even asking him any questions about that?

A.      Oh, I asked him some questions.  I just mean that I did not – we're just told not to begin to interrogate people.  I mean I'm allowed to say if someone is bleeding on the scene and, you know, hey, how did that happen.

Q.      Right.

A.      You know, but things like that.  But ...

Q.      Were you asking him specifically how he cut his thumb?

A.      Yes, I asked him how – yes, I asked him a couple times, well, how did that happen, you know.  Because even again, the doctors, the nurses, the medics they all asked the same questions numerous times.

Q.      And he said I don't know?

A.      He could not give us an answer.  I don't know if he said "I don't know."

Q.      What did he say?

A.      He just didn't answer.  He just did not answer the question and went to a different subject and began, you know, talking in different directions, sir, is the best way I can explain.

Officer Graber testified:

Q.      Did he tell you anything about how he got that injury?

A.      No, he didn't talk about the specific injury itself.  He did make remarks about the altercation.

Q.      And what were those remarks?

A.      He stated that he was inside the club and was approached

-32-

|     | by two individuals.  And he felt disrespected.  And that they started verbally attacking him. |
| --- | --- |
| Q. | Let me back up.  This conversation that you were having, this was at the hospital? |
| A. | Yes. |
| Q. | And this is while you're waiting for doctors and nurses to treat the defendant? |
| A. | Right. |
| Q. | Were you asking him any questions about the incident at that time? |
| A. | No, we didn't ask him any specific questions.  He just started talking while we were waiting. |
| Q. | And how does your job differ from that of a detective? |
| A. | Well, if we were doing an official interrogation, we would have read his Miranda Rights and proceeded in a more formal interview. |

Following this testimony, Petitioner's counsel moved for a mistrial.  Counsel argued that the prosecutor's questioning regarding the injury to Petitioner's hand permitted the jury to hear that Petitioner offered no explanation.  Counsel contended that this bit of testimony raised the issue of "post-arrest silence."

The trial court denied the motion for a mistrial, concluding that Petitioner was not being subjected to interrogation such that any violation of *Doyle* or *Miranda* could have occurred.  The trial court also found that Petitioner voluntarily offered statements about the altercation.  On appeal, the Tenth District agreed that Petitioner had not been subject to a custodial interrogation regarding the circumstances of how he had been injured and that he had spoken voluntarily.

*Doyle*, relied upon by the state courts, establishes that a prosecutor may not comment on a defendant's post-arrest silence as substantive evidence of guilt for the crime.  *Doyle v. Ohio*, 426 U.S. 610, 619 (1976).  "[T]he use ... of [a defendant's] silence , at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment."  *Id*. at 619.  *Doyle*, however, applies only in the context of post-*Miranda* silence.  *U.S. v. Peyton*, 183 Fed.Appx. 539, 548 (6th Cir. 2006),

-33-

citing *Fletcher v. Weir*, 455 U.S. 603, 607 (1982).  Where the record is silent with respect to whether a defendant received *Miranda* warnings, comments on a defendants' post-arrest silence do not violate due process.  *United States v. Christian*, 404 Fed.Appx. 989, 992-93 (6th Cir. 2010).  Here, the testimony suggests that, although he was in custody, Petitioner had not been given his *Miranda* warnings because neither officer believed they were engaged in a custodial interrogation.  Putting aside the issue of whether the officers' questioning satisfies the requirements of an interrogation (and again, the lower courts concluded it did not), it appears that, assuming for this Court's purposes that it did,  the situation in which Petitioner found himself was post-arrest, pre-*Miranda*. Consequently, this Court does not view the circumstances of this case as fitting squarely within the bounds of *Doyle*.

However, assuming, as Petitioner contends, that his silence was used as substantive evidence against him, Petitioner is not entitled to habeas relief on this claim. In this case, the state appellate court's decision to uphold Petitioner's conviction, even if  his post-arrest, pre-*Miranda* silence was used as substantive evidence of guilt, was not contrary to or an unreasonable application of clearly established federal law.  At the time of Petitioner's trial, the constitutionality of using a criminal defendant's post-arrest, pre-*Miranda* silence as substantive evidence had not been addressed by the United States Supreme Court and disagreement existed among the federal circuits.  *Hall v. Vasbinder*, 563 F.3d 222 (6th Cir. 2009);  *Pearson v. Romanowski*, 2013 WL 6801162 (E.D. Mich. December 23, 2013).  Consequently, the state appellate court's decision to uphold Petitioner's conviction despite the alleged use of his post-arrest, pre-*Miranda* silence was not contrary to or an unreasonable application of clearly established federal law and Petitioner is not entitled to habeas relief.

Finally, even assuming that the testimony elicited from Officers Graber and Ewing violated Petitioner's Fifth Amendment right to remain silent, he still is not entitled to relief.  For purposes of determining whether federal habeas relief must be granted to a state prisoner on the ground of federal constitutional error, the appropriate

-34-

harmless error standard to apply is whether the error had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The Court finds that the isolated testimony, not referenced by the prosecutor in closing argument nor revisited during any other portion of the trial in light of the evidence of guilt, did not have a substantial and injurious influence in determining the jury's verdict. Consequently, Petitioner is not entitled to habeas relief on his fifth claim.

## D.  GROUND SIX

Petitioner's sixth ground for relief is that he was denied the effective assistance of appellate counsel when his counsel failed to raise a number of issues on direct appeal. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The court in *Strickland* announced the now familiar two-prong test to determine if there was ineffective assistance of counsel, which would result in reversible error:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687.

"Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance [ ... ]." *Id.* "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The United States Supreme Court has recently cautioned federal habeas courts to "guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Harrington v. Richter*, --- U.S. ----, ----, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011). The Court observed that while " '[s]urmounting *Strickland*'s high bar is never an easy task [,]' ... [e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult." *Id.* (*quoting Padilla v. Kentucky*, --- U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010)). The Court instructed that the standards created under *Strickland* and § 2254(d) are both " 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* (citations omitted). Thus, when a federal habeas court reviews a state court's determination regarding an ineffective assistance of counsel claim, "[t]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

Claims of ineffective assistance of appellate counsel are governed by the *Strickland* analysis. *Haliym v. Mitchell*, 492 F.3d 680, 694 (6th Cir.2007).   "In order to succeed on a claim of ineffective assistance of appellate counsel, a Petitioner must show errors so serious that counsel was scarcely functioning as counsel at all and that those errors undermine the reliability of the defendant's convictions." *McMeans v. Brigano*, 228 F.3d 674 (6th Cir. 2000), *citing Strickland*, 466 U.S. 668; and *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). Counsels' failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *McFarland v. Yukins*, 356 F.3d 688 (6th Cir. 2004), *citing Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir .2001), *cert. denied*, 535 U.S. 940 (2002). "Counsel's performance is strongly presumed to be effective." *McFarland*, 356 F.3d at 710, *quoting Scott v. Mitchell*, 209 F.3d 854, 880 (6th Cir.2000)(citing *Strickland* ).

Petitioner identifies ten different issues which he claims counsel failed to raise on appeal in violation of *Strickland.*  With respect to claims 1, 5, 6, 9, and 10, respondent argues that Petitioner was represented by the same attorney at trial and on direct appeal

and that, under Ohio law, this counsel was not required, on appeal, to raise the issues regarding his own ineffective assistance at trial. Respondent argues that this precludes Petitioner from satisfying the first prong of the *Strickland* test because Petitioner cannot demonstrate that his appellate counsel's performance was deficient as it relates to these five claims. The Court agrees that Petitioner cannot satisfy the *Strickland* test but the Court views respondent's argument as more appropriately directed to the issue of prejudice.

As a general matter, a defendant who is convicted in Ohio of a criminal offense has two avenues for attacking that conviction - direct appeal and collateral attack. Claims appearing on the face of the record must be raised on direct appeal, or they will be waived under Ohio's doctrine of res judicata. *See State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967). Issues which must be raised in a postconviction action pursuant to R.C. § 2953.21 include claims which do not appear on the face of the record and claims of ineffective assistance of trial counsel where the defendant was represented on direct appeal by the same attorney who represented him at trial. *State v. Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169 (1982). *See Van Hook v. Anderson*, 127 F.Supp.2d 899 (S.D. Ohio 2001); *Jenkins v. Sheets*, 2009 WL 3151232 (S.D. Ohio 2009).

In light of this, Petitioner cannot claim that he was prejudiced by his appellate counsel's failure to raise issues on direct appeal relating to that same attorney's alleged shortcomings as trial counsel. Rather, under the circumstances of this case, the avenue of collateral attack through a postconviction petition was available to Petitioner to address the issues of his trial counsel's alleged deficiencies. Under this scenario, Petitioner cannot establish that a "reasonable probability" exists that the outcome of his direct appeal would have been different. Consequently, Petitioner will not be granted relief on grounds 1, 5, 6, 9 and 10 of his ineffective assistance of appellate counsel claim.

The second and third ground for Petitioner's ineffective assistance of appellate counsel claim relate to the issue of testimony permitted over objection. The second ground asserts that appellate counsel should have raised the issue of trial court error in

allowing the victim to testify over objection regarding why he was "cautious" of Petitioner. The third ground is that appellate counsel should have raised the issue of trial court error in allowing the victim's cousin to testify as to why the victim was "cautious" of the Petitioner.

In reviewing his postconviction petition, the Tenth District Court of Appeals concluded that both sets of testimony were properly admissible under Ohio Evid. R. 404(B) because the testimony provided background information about the nature of the relationship between the victim and Petitioner and was proof of motive. Consequently, applying the *Strickland* standard, the state court concluded that Petitioner failed to demonstrate that his appellate counsel rendered ineffective assistance for failing to raise these issues on direct appeal.

The appellate court's decision was neither an unreasonable application of federal law nor based on an unreasonable determination of the facts. The state court determined that Petitioner's evidentiary claims were without merit. This Court is bound by the state court's interpretation of state law. *See Brooks v. Anderson*, 292 Fed. App'x. 431, 437-38 (6th Cir. 2008) ("this Court has held that federal habeas courts must defer to a state court's interpretation of its own rules of evidence and procedure when assessing a habeas petition. It stands to reason that this is true even when the Petitioner is not seeking habeas relief on the state court evidentiary determination at issue.") (citations and internal quotation marks omitted). *See also Adams v. Smith*, 280 F.Supp.2d 704, 721 (E.D.Mich.2003) (deferring to the state court's evidentiary determination that contested testimony was not hearsay in rejecting a claim of ineffective assistance of counsel for failure to object to the alleged hearsay). Accordingly, because Petitioner's evidentiary claims are without merit, the Ohio Court of Appeals reasonably determined that appellate counsel was not ineffective for failing to raise the claims on appeal. *Davie v. Mitchell,* 547 F.3d 297, 312 (6th Cir. 2008); *Willis v. Smith,* 351 F.3d 741, 745 (6th Cir. 2003). Petitioner is therefore not entitled to habeas relief based on the ineffective assistance of appellate counsel relating to these claims.

Petitioner's fourth basis for his ineffective assistance of appellate counsel claim is that appellate counsel should have raised the issue of the trial court's error in using the wrong standard in deciding the discoverability of materials sought by the defense under Crim. R. 16.  As this claim was raised in his postconviction petition, Petitioner argues that the trial court improperly applied the *Brady* standard to determine whether the subpoenaed report was discoverable when the trial court should have considered only whether the information sought was favorable and material either to guilt or punishment.  *See Motion to Dismiss, Exhibit 22.*

In addressing this issue in Petitioner's postconviction petition, the state appellate court held that similar arguments were raised and rejected on direct appeal.  Further, the appellate court noted that it had, on direct appeal, reviewed the sealed record and determined that there was no evidence of a *Brady* violation nor any information which would have altered the jury's verdict.  Consequently, the appellate court concluded that Petitioner could not demonstrate prejudice under *Strickland*.

In reviewing the record, the Court notes that not only did the trial court evaluate the evidence under *Brady,* but it also concluded that the report was "not material to the issues in this case," was not "germane" and would not "be a basis for legitimate cross examination of any witness in this case."  Tr. Vol. I pp. 93-99.  The appellate court agreed.  Because the appellate court acknowledged the breadth of the trial court's decision and upheld it on direct appeal, no reasonable probability existed that the result of the appeal would have been different.  Consequently, Petitioner has not established that the appellate court's decision involved an unreasonable application of *Strickland*.

Petitioner's seventh basis for his ineffective assistance of appellate counsel claim is that appellate counsel should have raised the issue of the trial court's error in overruling the defense motion for a continuance in order to subpoena the victim to question him about statements made to emergency room personnel.  Respondent argues that the trial court reasonably determined a continuance was not necessary because defense counsel had the relevant medical report and could have cross-

examined the victim as to it during the State's case in chief.

In addressing Petitioner's postconviction petition, the state appellate court held that this issue hinged upon the validity of admissibility of various statements the victim had made which the trial court had barred. The state appellate court determined that the trial court had not erred in barring the statements on grounds of prejudice and, therefore, there was no probability of success had this issue been raised on appeal. The appellate court also noted that the trial court had the discretion to bar the admission of these statements as hearsay and that there was no evidence of inconsistency in the statements. A "denial of a continuance rises to the level of a constitutional violation only when there is an unreasoning and arbitrary insistence upon expeditiousness in the face of [a] justifiable request for delay." *Burton v. Renico*, 391 F.3d 764, 772 (6th Cir. 2004). Here, Petitioner has not demonstrated that the trial court's denial of a continuance was unreasonable given its evidentiary rulings that the statements were prejudicial. Again, Petitioner has failed to demonstrate that the state appellate court's determination that Petitioner had not demonstrated prejudice is not contrary to or an unreasonable application of federal law.

Petitioner's eighth basis for his ineffective assistance of appellate counsel claim is that the trial court erred in refusing to allow the defense to play a video tape recording of Petitioner's statement to the police. As explained in the state appellate court's opinion addressing this issue as raised in Petitioner's postconviction petition, Petitioner sought to introduce the interview to rebut that state's evidence that he did not explain to the police how he received the cut to his hand. Here, respondent argues, among other things, that Petitioner is not entitled to habeas relief because defense counsel was able to refute any suggestion that Petitioner was not forthcoming about the cut to his hand when questioning Petitioner on direct examination.

A review of the transcript reveals the following testimony by Petitioner on direct examination:

Q.     And did you talk to [Detective Siniff] freely and answer all his questions?

A.      Yes, yes.

Q.      Not a single question did you not answer, right?

A.      I answered every question he asked me.

Q.      He asked you how you cut your finger, didn't he?

A.      Yes.

Q.      And you told him, didn't you?

A.      Yes.

...

Q.      Did he ask you how you hurt your finger?

A.      Yes, sir, he did.

Q.      And you had nothing to hide, correct?

A.      No, I didn't.

Q.      And did you explain to him the whole incident in detail?

A.       Yes, sir, I did.

Tr. Vol. IV, pp. 77-78.

The state appellate court, in addressing this issue in the postconviction proceeding, noted with approval the various evidentiary grounds on which the trial court had excluded the interview tape.  However, the court also held, relying on the testimony quoted above, that Petitioner was unable to demonstrate that the outcome of the trial would have been different had the tape been allowed to be played.   As the appellate court found, Petitioner testified about his interview and stated that he answered every question including the questions about how Petitioner had cut his hand.    This Court agrees that, based on Petitioner's own testimony set forth above, the outcome of the trial would not have been any different had the interview tape been played.  Consequently, the Court finds that this ground for relief lacks merit.

### V.  THE MOTION FOR LEAVE TO AMEND

The proposed seventh ground for relief states as follows

Garri Ambartsoumov was denied effective assistance of counsel

-41-

when his counsel failed to investigate and present testimonial evidence that Alex Nercessian cut Arut Khoulian's neck and Armen Stepanyan cut Tigran Safaryan's arm.

This ground for relief was included in the original petition.  At the time of the filing of the original complaint, Petitioner's appeal relating to this ground was pending, making this claim unexhausted.  By order dated May 16, 2013, Petitioner was directed to delete this unexhausted claim or this action would be dismissed without prejudice. On June 3, 2013, Petitioner filed an amended petition for a writ of habeas corpus which did not contain this claim.  Petitioner has filed a supplemental state court appendix documenting his exhaustion of this proposed claim.

In response, respondent argues that the proposed amendment is futile. Respondent contends that the proposed amendment is barred by the statute of limitations, having been required to be filed by March 22, 2013.  According to the respondent, the proposed amendment neither relates back to the first amendment nor is it subject to equitable tolling.  Further, respondent asserts that the claim is procedurally defaulted and that Petitioner has failed to make an actual innocence showing to overcome his procedural default.

Petitioner has filed a one-page, eight-line reply.  In this reply, Petitioner states that this claim was pending before this Court on March 22, 2013, and that it relates back to the filing of the original petition.  Petitioner does not address the issue of procedural default.

## A.  LEGAL STANDARD

Fed.R.Civ.P. 15(a)(2) states that when a party is required to seek leave of court in order to file an amended pleading, "[t]he court should freely give leave when justice so requires." The United States Court of Appeals for the Sixth Circuit has spoken extensively on this standard, relying upon the decisions of the United States Supreme Court in *Foman v. Davis*, 371 U.S. 178 (1962) and *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971), decisions which give substantial meaning to the phrase "when

justice so requires."  In *Foman*, the Court indicated that the rule is to be interpreted liberally, and that in the absence of undue delay, bad faith, or dilatory motive on the part of the party proposing an amendment, leave should be granted.  In *Zenith Radio Corp.*, the Court indicated that mere delay, of itself, is not a reason to deny leave to amend, but delay coupled with demonstrable prejudice either to the interests of the opposing party or of the Court can justify such denial.

Expanding upon these decisions, the Court of Appeals has noted that:

> [i]n determining what constitutes prejudice, the
> court considers whether the assertion of the new
> claim or defense would: require the opponent to
> expend significant additional resources to conduct
> discovery and prepare for trial; significantly
> delay the resolution of the dispute; or prevent
> the plaintiff from bringing a timely action in
> another jurisdiction.

*Phelps v. McClellan*, 30 F.3d 658, 662-63 (6th Cir. 1994) (citing *Tokio Marine & Fire Insurance Co. v. Employers Insurance of Wausau*, 786 F.2d 101, 103 (2d Cir. 1986)).  *See also Moore v. City of Paducah*, 790 F.2d 557 (6th Cir. 1986); *Tefft v. Seward*, 689 F.2d 637 (6th Cir. 1982).  Stated differently, deciding if any prejudice to the opposing party is "undue" requires the Court to focus on, among other things, whether an amendment at any stage of the litigation would make the case unduly complex and confusing, *see Duchon v. Cajon Co.*, 791 F.2d 43 (6th Cir. 1986) (per curiam), and to ask if the defending party would have conducted the defense in a substantially different manner had the amendment been tendered previously.  *General Electric Co. v. Sargent and Lundy*, 916 F.2d 1119, 1130 (6th Cir. 1990); *see also Davis v. Therm-O-Disc*, Inc., 791 F. Supp. 693 (N.D. Ohio 1992).

The Court of Appeals has also identified a number of additional factors which the District Court must take into account in determining whether to grant a motion for leave to file an amended pleading.  They include whether there has been a repeated failure to cure deficiencies in the pleading, and whether the amendment itself would be

an exercise in futility. *Robinson v. Michigan Consolidated Gas Co.*, 918 F.2d 579 (6th Cir.1990); *Head v. Jellico Housing Authority*, 870 F.2d 1117 (6th Cir.1989). The Court may also consider whether the matters contained in the amended complaint could have been advanced previously so that the disposition of the case would not have been disrupted by a later, untimely amendment. *Id*.

## B. PROCEDURAL DEFAULT

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the state courts for consideration. 28 U.S.C. § 2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present his claims, then his petition is subject to dismissal for failure to exhaust state remedies. *Id*.; *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971). But if, because of a procedural default, the Petitioner can no longer present his claims to the state courts, then he has also waived those claims for purposes of federal habeas corpus review, unless he can demonstrate both cause for the procedural default, as well as actual prejudice from the alleged constitutional error. *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is waived by the Petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "First, the court must determine that there is a state procedural rule that is applicable to the Petitioner's claim and that the Petitioner failed to comply with the rule." *Id*. Second, the Court must determine whether the state courts actually enforced the state procedural sanction. Id. Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim. *Id*. Finally, if the Court has determined that a state procedural rule

was not complied with, and that the rule was an adequate and independent state ground, then the Petitioner must demonstrate that there was cause for him not to follow the procedural rule, and that he was actually prejudiced by the alleged constitutional error. *Id*. This "cause and prejudice" analysis applies to failures to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985).

The procedural history of Petitioner's proposed claim is as follows. On April 18, 2012, Petitioner filed a motion for leave to file a delayed motion for a new trial, alleging he had discovered new evidence indicating that several individuals, other than himself and his co-defendant, had committed the offenses. By entry dated September 12, 2012, the trial court denied leave to file a delayed motion for new trial. In denying this motion, the trial court concluded that Petitioner had failed to prove by clear and convincing evidence that he had been unavoidably delayed from discovering, within the 120-day time limit, the evidence upon which he was relying in support of his motion. The state appellate court agreed by decision issued July 11, 2013. In reaching its decision, the appellate court stated:

{¶ 11} Crim.R. 33(B) states in part:

Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

{¶ 12} Thus, "Crim.R. 33(B) provides a mechanism for allowing a new trial motion based on newly discovered evidence to be reviewed by the trial court beyond the prescribed one hundred twenty day time limit." *State v. Shakoor*, 7th Dist. No. 10 MA 64, 2010–Ohio–6386, ¶ 16. A defendant is to file a motion for leave, and must "show by clear and convincing proof that he has been unavoidably prevented from discovering, within the one hundred twenty day time limit, the evidence that he is relying on to support his motion for new trial." Id. "[A] party is unavoidably prevented

from filing a motion for new trial if the party had no knowledge of the existence of the ground supporting the motion for new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence." *State v. Walden*, 19 Ohio App.3d 141, 145–46 (10th Dist.1984). Further, "[m]ost courts * * * also require defendants to file a motion for leave within a reasonable time after discovering the evidence." *State v. Peals*, 6th Dist. No. L–10–1035, 2010–Ohio–5893, ¶ 22, citing *State v. Grinnell*, 10th Dist. No. 09AP–1048, 2010–Ohio–3028.
...

{14} In order to prevail on a motion for new trial based upon newly discovered evidence, a defendant must show that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence. *State v. Petro*, 148 Ohio St. 505 (1947). However, a trial court "may not * * * 'consider the merits of the motion for a new trial until it makes a finding of unavoidable delay.' " *Peals* at ¶ 21, quoting *State v. Lanier*, 2d Dist. No.2009 CA 84, 2010–Ohio–2921, ¶ 17. Accordingly, " 'unless a trial court has granted a defendant leave to file a delayed motion for new trial, the motion for a new trial is not properly before the court.' " *Peals* at ¶ 21, quoting *State v. Clumm*, 4th Dist. No. 08CA32, 2010–Ohio–342, ¶ 26.

{¶ 15} As noted under the facts, appellants submitted the affidavits of three individuals who each averred that they were at the restaurant on the night of the incident and observed individuals other than Veliev and Ambartsoumov commit the offenses. Each of these witnesses stated they were afraid to come forward for fear of retaliation, and one of the witnesses stated that he told a police officer at the scene that he did not observe anything that night.

{¶ 16} Appellants also submitted the affidavit of Palmer, trial counsel for Veliev, in which Palmer stated he had reviewed the affidavits of Irina Stevens, Artur Melkumov, and Irina Melkumov, and that "[a]t no time" did these witnesses "tell me" they were outside the restaurant on May 17, 2008 during the incident, and that "[a]t no time did [they] tell me" their version of how the stabbings took place. Palmer averred that "[t]he first time I heard this information was when Ambartsoumov's present attorney provided me with the affidavit in 2012." The affidavit of Shamansky, trial

counsel for Ambartsoumov, contained almost identical statements as those set forth in Palmer's affidavit.

{¶ 17} The affidavit of Veliev states that he had reviewed the affidavits of Irina Stevens, Artur Melkumov, and Irina Melkumov and that "[a]t no time" did these witnesses "tell me" that they were outside the restaurant on the evening of May 17, 2008, and "[a]t no time" did they relate to him their version of the stabbings. According to Veliev, "[t]he first time I heard this information was when my present attorney told me about it in 2011." Ambartsoumov submitted an almost identically worded affidavit.

{¶ 18} The trial court found that appellants had not demonstrated, by clear and convincing evidence, that the defense was unavoidably prevented from discovering the evidence of these three witnesses. The trial judge, who presided over the 2009 trial of both appellants, noted that the crimes arose from a spontaneous knife fight between patrons of the restaurant, and that there were "[m]any people" in the vicinity of the restaurant that evening; thus, the police officers arriving at the scene "faced a challenging investigation, at night and in the rain, with a large number of potential witnesses."

{¶ 19} With respect to the affidavits submitted by the new witnesses, the trial court noted that all three witnesses indicated in their affidavits that they recognized both Veliev and Ambartsoumov before the stabbings; however, "[n]one of the three witness affidavits explain when these witnesses first came forward, or to whom," and thus "[w]e are left to guess how, when and why they lost their professed fear of reprisal." The court further noted that, while the affidavit of Ambartsoumov indicates he learned of the "professed change of heart" of these witnesses in 2011, "[n]one of the witnesses explain if they contacted him in 2011, or set out any other facts about how they came forward," nor do these witnesses "say, one way or the other, whether they were interviewed by the original trial lawyers (or their investigators) before trial in 2009."

{¶ 20} In denying appellants' amended motion for leave to file a delayed motion for new trial, the trial court held in relevant part:

Clear and convincing evidence has not been presented that the defense was unavoidably prevented from discovering the evidence of these three witnesses. No one disputes that these three were present at the scene of the crimes. Apparently, no one disputes that they were known to the

-47-

defense and even listed among a number of potential witnesses on the state's witness disclosure. Yet, the affidavits provided by defense counsel[ ] do not refer to their contact, or lack of contact with these people. Trial counsel vigorously defended this case. They are in the best position to supply evidence that they did not know of the witnesses if that were true. They are in the best position to say now whether they, or an investigator working for them, met with each of the three witnesses before trial. They could tell us whether the witnesses told them a different story, or simply refused affirmative requests to meet for an interview. There is no such information provided. No suggestion comes from either attorney Palmer or attorney Shamansky that any of the three of them hid, or placed themselves beyond the range of a reasonable investigation by the defense, much less beyond the Subpoena power. That being true, no clear and convincing evidence has been presented that the defense was "unavoidably prevented" from using the three witnesses back in 2009.

It merits mention that unlike most single-defendant cases this trial had two co-defendants with privately retained counsel. Both mounted a spirited, coordinated defense. In most respects their efforts appeared closely aligned, and both defendants potentially would have profited if the evidence tendered now had been heard. In such a situation, there is even more reason to expect something more than has been obliquely suggested here in the lawyers' affidavits. The court is entitled to learn more about their joint investigation of witnesses together with their joint trial preparation and strategy when faced with a motion like this one. The court is asked to accept that they missed three potentially helpful witnesses which, given the court's familiarity with the work of defense counsel on these two cases, simply seems implausible. Both defendants were similarly motivated to leave no good lead unexplored. As the court recalls, both men remained out on bond through trial and might themselves have assisted counsel. So, simply alleging years later—without true backup evidence submitted under oath—that defense counsel utterly failed to follow up with these alleged eye witnesses is not readily to be accepted. The "clear and convincing" standard demands more.

(Footnote omitted.)

{¶ 21} Upon review, we agree with the trial court that appellants have not shown, by clear and convincing evidence, that they were unavoidably prevented from discovering, within the 120–day time limit, the evidence they are relying upon to support their motions. With respect to the three new witnesses, the state argued before the trial court that these witnesses

-48-

were on the state's witness list and known to the defense at the time of trial and that most of the witnesses were interviewed by police.

{¶ 22} In *State v. Wilson*, 10th Dist. No. 93AP–732 (Nov. 2, 1993), this court affirmed the trial court's dismissal of a defendant's motion for new trial in a case in which the defendant and several potential witnesses knew each other prior to trial. As to one of the witnesses, this court noted that the record contained no evidence of how this individual's potential as a witness, "however minimal, was ultimately discovered." As to a second witness, this court noted that the statement of this witness was "truly newly discovered evidence," and could not have been discovered within 120 days of the trial, but the record failed to indicate "whether or not anyone attempted to interview" him prior to trial. In holding that the defense failed to present clear and convincing proof that defendant was unavoidably prevented from discovering the evidence at issue, this court observed that "[i]f counsel, for whatever reason, cannot effectively communicate with the potential witnesses or cannot devote sufficient time to investigate personally, then the services of a private investigator can be retained." Other Ohio courts have similarly held that a defendant was not "unavoidably prevented from discovering the evidence" where the witnesses were known to the defense prior to trial. *See, e.g., State v. Saban*, 8th Dist. No. 73647 (Mar. 18, 1999); *State v. Nicholson*, 8th Dist. No. 70916 (May 1, 1997).

{¶ 23} Federal case law establishes that "if a defendant is aware of the evidence at the time of trial, then it is not newly discovered evidence under Rule 33." *United States v. Sims*, 72 Fed.Appx. 249, 252 (6th Cir.2003). Further, "where a witness who has indicated to the defendant * * * an unwillingness to testify truthfully at trial * * * but later supplies an affidavit exonerating the defendant of the offense, the affidavit is merely newly available evidence, but it is not newly discovered evidence." (Emphasis sic.) Id. Thus, "a post-trial affidavit exonerating the defendant that was provided by a witness who could have been called at trial, but was not, can never be considered newly discovered evidence under Rule 33." *Id.*, citing *United States v. Turns*, 198 F.3d 584 (6th Cir. 2000).

{¶ 24} In the present case, the affidavits of all three witnesses indicate they knew both Ambartsoumov and Veliev at the time of the incident. According to the affidavit of Irina Stevens, she was seated at the same table with appellants on the night of the events at issue. The trial court

-49-

noted no apparent dispute that these individuals were "known to the defense and even listed among a number of potential witnesses on the state's witness disclosure." The affidavit of one of the witnesses, Artur Melkumov, indicates he spoke with police during the investigation on the night of the incident. Further, it is clear from the trial testimony that Irina Stevens was known at the time of trial. Specifically, one of the trial witnesses, Dimitri Zubrick, testified that his girlfriend, Irina Stevens, went to the restaurant with him. According to Zubrick's testimony, his girlfriend Stevens "was never outside." (Tr. 153.) Zubrick also noted at trial that he spoke with a defense investigator prior to trial.

{¶ 25} Ohio courts have held that affidavits filed outside of the 120–day time limit of Crim.R. 33 that fail to offer a sufficient explanation as to why evidence could not have been obtained sooner are inadequate to show that the movant was unavoidably prevented from obtaining the evidence within the prescribed time. Shakoor at ¶ 21. *See also State v. Golden*, 10th Dist. No. 09AP–1004, 2010–Ohio–4438, ¶ 19 (where appellant failed to explain the investigative actions taken or why he was unavoidably prevented from discovering potential witnesses, trial court did not abuse its discretion in determining appellant failed to demonstrate by clear and convincing proof that he was unavoidably prevented from discovering the witness or her statement within the time limitation of Crim.R. 33(B)); *State v. Dawson*, 9th Dist. No. 19179 (July 14, 1999) (noting, in case affirming trial court's denial of leave to file motion for new trial, that affidavits submitted failed to give specific timeline of defendant's attempts to gain exculpatory testimony or provide any reason why defendant could not have discovered the evidence before the 120–day period had elapsed); *State v. Wilson*, 7th Dist. No. 11 MA 92, 2012–Ohio–1505, ¶ 57 ("the affidavits and the motion for leave do not contain enough information to conclude that Wilson was unavoidably prevented from discovering the evidence within the prescribed period").

...

{¶ 30} Appellants in this case bore the burden of establishing, by clear and convincing evidence, that they were unavoidably prevented from discovering these witnesses earlier. *Nicholson*. We agree with the trial court that appellants have not shown, through the affidavits submitted, that the new witnesses were unknown or "placed beyond the range of a reasonable investigation by the defense, much less beyond the Subpoena power." Upon review, appellants failed to prove by clear and convincing evidence that they were unavoidably prevented from discovering, within the prescribed time period, the evidence they are relying on to support their motions. Accordingly, the trial court did not abuse its discretion in

denying appellants' amended motions for leave to file a delayed motion
for new trial.

*State v. Ambartsoumov* , 2013 WL 3488186 (Ohio App. 10 Dist. July 11,2013).

Based on the above, there is no question that Petitioner failed to comply with a
state procedural rule. Further, as set forth at length by the state appellate court, the
state court enforced the procedural sanction. Consequently, the Court finds the first
two parts of the *Maupin* test to be satisfied. Third, the untimeliness of a motion for a
new trial is an adequate and independent state ground on which the state may rely to
foreclose habeas review. *See Minor v. Warden, Lebanon Correctional Inst.*, 2014 WL
1276582, *14 (S.D. Ohio March 27, 2014). Because Petitioner has not addressed the issue
of procedural default, he has not made any showing of either cause to excuse the
default or actual prejudice. Similarly, Petitioner has not come forward with any
evidence demonstrating his actual innocence. Consequently, it will be recommended
that the motion for leave to amend be denied on grounds of procedural default of the
proposed claim.

## VI. RECOMMENDED DISPOSITION

For the foregoing reasons, the Court **RECOMMENDS** that the petition for a writ
of habeas corpus be **DISMISSED**. Further, the Court recommends that the motion for
leave to amend be denied.

## PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within
fourteen days of the date of this Report, file and serve on all parties written objections to
those specific proposed findings or recommendations to which objection is made,
together with supporting authority for the objection(s). A judge of this Court shall
make a *de novo* determination of those portions of the report or specified proposed
findings or recommendations to which objection is made. Upon proper objections, a
judge of this Court may accept, reject, or modify, in whole or in part, the findings or
recommendations made herein, may receive further evidence or may recommit this matter to the

magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

/s/ Terence P. Kemp
United States Magistrate Judge